UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRIENDS OF THE DELAWARE RIVER LLC,<br><br>Plaintiff,<br>vs.<br><br>SUPERIOR SCAFFOLD SERVICES, INC.,<br><br>Defendant. | **Civil No.: 2:26-cv-08239**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**JURY TRIAL DEMAND** |

Plaintiff, Friends of The Delaware River LLC ("FOTDR" or "Plaintiff"), by and through its counsel, alleges as follows:

1. This is a citizen suit, brought pursuant to the Section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendant Superior Scaffold Services, Inc. ("Superior Scaffold" or the "Defendant") arising out of operations at Superior Scaffold's facility located at 600 Center Avenue, Unit 2, Bensalem, PA 19020 (the "Facility").

2. Since at least June 2021, Defendant has been discharging and continues to discharge polluted stormwater from the Facility without a permit in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, in violation of Pennsylvania's Clean Streams Law (the "CSL"), and in violation of the PAG-03 National Pollutant Discharge Elimination System ("NPDES") General Permit for Discharges of Stormwater Associated with Industrial Activity (the "General Permit") issued by the Commonwealth of Pennsylvania.

3. Plaintiff seeks declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendant's repeated and ongoing violations of the CWA.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief). This Court has supplemental jurisdiction over Plaintiff's claims arising under the CSL pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the federal claims.

5. On July 22, 2026, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff provided a notice of intent to file suit against Defendant for violations of the CWA and the CSL ("Notice Letter") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region III; the Regional Administrator of the Pennsylvania Department of Environmental Protection ("DEP") Southeast Region; the Administrator of the DEP (collectively, "State and Federal Agencies"); and Defendant.

6. The Notice Letter provided Defendant with sufficient information to determine (i) the CWA requirements Plaintiff alleges Defendant violated, (ii) the activity alleged to constitute the violation(s), (iii) sufficient information to determine the date, location, and person responsible for the violation(s), and (iv) the contact information for the Plaintiff and Plaintiff's Counsel. A copy of the Notice Letter is attached as Exhibit 1.

7. More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal Agencies. During this time, neither the EPA, nor the Commonwealth of Pennsylvania, has commenced or is diligently prosecuting a court action to

redress the violations alleged herein. No claim in this action is barred by any prior administrative action pursuant to Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8. Venue is proper in the Eastern District of Pennsylvania pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

9. Plaintiff is an organization established to protect the watersheds located within the Southeast Region of the Commonwealth of Pennsylvania. Plaintiff and its members are concerned with the environmental health of the Delaware River, and its members use and enjoy the waters of the Delaware River, its inflows, outflows, and other areas of the overall Delaware River Watershed, into which the stormwater discharges from the Facility flow. Plaintiff's members use and enjoyment of these waters is negatively affected by the pollution caused by Defendant's operations. Plaintiff and its members are dedicated to protecting the water quality of the Delaware River, its inflows, outflows, and other areas of the overall Delaware River Watershed, for the benefit of its ecosystems and communities. To further these goals, Plaintiff actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of itself and for its members and community.

10. Plaintiff's members, like other citizens, taxpayers, property owners, and residents of its community, live, work, travel near, and recreate in close proximity to the confluence of the Delaware River, its inflows, outflows, and other areas of the overall Delaware River Watershed, of which the Delaware River is a part, into which Defendant discharges pollutants. Plaintiff's members, like other citizens, taxpayers, property owners, and residents, use and enjoy the Delaware River, its inflows, outflows, and other areas of the overall Delaware River Watershed, of which the Delaware River is a part, for recreational, educational, scientific, conservation,

aesthetic, spiritual, and other purposes. Defendant's discharge of stormwater containing pollutants impairs each of these uses. Thus, Plaintiff's members' interests have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the General Permit.

11. Plaintiff's members enjoy relaxing in and around and traversing through the areas adjacent to the affected waters.

12. Plaintiff's members have witnessed the polluted nature of the Delaware River. Plaintiff's members have observed that the Delaware River appears both brown and dirty. In addition to their visual observation of the water, Plaintiff's members have also noticed an unpleasant smell coming from the waters. For example, the President of FOTDR, is an avid jet skier. He, together with other FOTDR members, regularly traverse the Delaware River in and around the Facility as well as the Delaware River near Neshaminy State Park.

13. Plaintiff is aware that Defendant's Facility is upstream and that the pollution from the Facility flows downstream via direct flow into the Bensalem Township MS4 sewer system, which empties directly into the Delaware River. Plaintiff believes that this has degraded the beauty of the adjacent waters and curtailed its members' enjoyment of the adjacent area.

14. Plaintiff's members believe that reducing Defendant's pollution of the Delaware River will improve the water quality in the Delaware River and allow its members the opportunity to better enjoy the recreational and aesthetic interests in the Delaware River.

15. Defendant Superior Scaffold is a Pennsylvania Corporation with its listed principal place of business 600 Center Avenue, Unit 2, Bensalem, PA 19020.

16. Defendant owns and operates the Facility.

17. The Facility operates as, amongst other things, a scaffold and shoring sales, rental, storage, fabrication, and distribution facility. Other activities likely carried out in the regular course

of business at the Facility include fabrication of custom scaffold platforms, storage of substantial quantities of scaffolding components, galvanized and corroding steel, pipe stock, lumber, pallets, and related industrial materials outdoors, storage of fuel and other oils, maintenance, equipment storage, and waste storage. Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.

18. The Facility's activities constitute "storm water discharge[s] associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14), under one or more of the following alternative classifications: (i) the on-site fabrication of custom structural scaffold systems, platforms, and ladders constitutes fabricated metal products manufacturing within SIC Code 3441 (Fabricated Structural Metal Products), which is expressly identified in category (ii) of § 122.26(b)(14) and requires NPDES permit coverage without regard to exposure (corresponding to Appendix U (Fabricated Metal Products) of the General Permit); (ii) related fabrication classifications within SIC Major Group 34 (except 3441) are enumerated in category (xi) of § 122.26(b)(14), and a category (xi) facility must obtain NPDES permit coverage unless it qualifies for and certifies a condition of "no exposure" under 40 C.F.R. § 122.26(g) and 25 Pa. Code § 92a.32(b), an exclusion unavailable where any industrial materials or activities are exposed to precipitation and which, on information and belief, Superior Scaffold has never sought or obtained; (iii) the accumulation and handling of scrap steel and used equipment constitutes activity within SIC Code 5093 and category (vi) of § 122.26(b)(14); and (iv) in the alternative, to the extent the Facility's industrial activities are not described by any sector-specific appendix to the General Permit, the Facility is subject to permitting under Appendix J of the General Permit. By its terms, Appendix J applies to stormwater discharges associated with industrial activity from facilities

whose industrial activity "is not described by any other appendix in this General Permit and are designated as needing a permit in accordance with the CSL and/or 40 CFR § 122.26."

19. Regardless of the SIC Code under which Superior Scaffold characterizes its operations, NPDES permit coverage is determined based on the industrial activities actually conducted at the Facility. *See*, General Permit, Fact Sheet; 40 C.F.R. § 122.26(b)(14); 25 Pa. Code § 92a.32. Plaintiff's investigation confirms that the Facility stores substantial quantities of scaffolding components, galvanized and corroding steel, pipe stock, lumber, pallets, and related industrial materials outdoors; ponded stormwater has been observed in contact with stored industrial materials; and that materials are handled throughout the yard by forklift and truck. These practices create stormwater exposure independent of any discrete construction project and establish that the Facility conducts stormwater discharges associated with industrial activity requiring NPDES permit coverage under 40 C.F.R. § 122.26(b)(14) (including categories (ii) and (vi)) and the corresponding sector-specific appendices to the General Permit; in the alternative, these practices bring the Facility within Appendix J (Additional Industrial Facilities) of the General Permit. . *See*, General Permit, Fact Sheet, PAG-03 Appendix § J, p. 4.



20. Since stormwater associated with these outdoor industrial activities is discharged from the Property, NPDES permit coverage is required under Pennsylvania law, Superior Scaffold

has failed, and continues to fail, to obtain such coverage, in violation of the General Permit and the CWA.

## REGULATORY BACKGROUND

***The Problem of Stormwater Pollution***

21. Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of the Delaware River, its tributaries, and the overall Delaware River Watershed, of which the Delaware River is a part. With every rainfall event, significant amounts of polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and into the Delaware River, its tributaries, and the overall Delaware River Watershed, of which the Delaware River is a part.

22. Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life. In particular, stormwater can contain heavy metal pollutants such as aluminum, iron, and zinc, as well as high concentrations of suspended solids, Total Phosphorous, pH, Oil & Grease ("O & G"), and nitrate plus nitrite nitrogen. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects. Heavy metals have been shown to alter activity in tissues and blood of fish.

23. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator/prey relationships (for example, turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. Inorganic

sediments, including settleable matter and suspended solids, have been shown to negatively impact species' richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

***The Clean Water Act***

24. The CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated CWA requirements. Section 301(a), 33 U.S.C. § 1311(a). Among other things, CWA Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

25. The CWA requires that NPDES permits be issued for stormwater discharges "associated with industrial activity" to a point source. CWA Section 402(p), 33 U.S.C. § 1342(p).

26. The "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

27. The CWA, Section 301(b), required that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater must achieve technology based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

28. The Third Circuit has held that "a discharge that is not in compliance with a permit is archetypal Clean Water Act violation, and subjects the discharger to strict liability." *United States v. Pozsgai*, 999 F.2d 719, 725 (3d Cir. 1993); see *also United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 175 (3d Cir. 2004); *Natural Resources Defense Council, Inc. v. Loewengart & Co.*, 776 F. Supp. 996, 998 (M.D. Pa. 1991); *Public Interest Research Group v. Powell Duffryn Terminals Inc.*, 913 F.2d at 68, 73 n. 10 (3d Cir. 1990) ("the Clean Water Act imposes strict

liability. All the plaintiff need do is establish that the defendant violated the terms of it NPDES permit"); *Am. Canoe Assoc., Inc. v. Murphy Farms Inc.,* 412 F.3d 536, 539-40 (4th Cir. 2005) (declining to "graft an exemption onto the jurisdictional requirements of section 505(a) to shield from suit those past violators who have undertaken good-faith remedial efforts at the time of the complaint," and noting that "it is plainly possible for those undertaking good-faith remediation … nevertheless 'to be in violation' of the Act within the meaning of section 505(a), because the CWA creates a regime of strict liability for violations of its standards").

29. Pursuant to this strict liability regime, neither the CWA nor its implementing regulations contain an exception for "de minimis" violations. *See*, *Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979); *Hawaii's Thousand Friends v. City & Cty of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993) (noting that the CWA does not excuse de minimis violations).

30. CWA Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1), see 33 U.S.C. § 1362(5).

31. CWA Section 505(a) authorizes a citizen suit action for injunctive relief. 33U.S.C. § 1365(a).

32. CWA violators are subject to an assessment of civil penalties of up to $68,445 per day per violation for penalties assessed on or after January 8, 2025. 33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.

***State Regulations***

33. CWA Section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA approved permit program for discharges. Pennsylvania was delegated the authority to administer the NPDES program in 1978.

34. In Pennsylvania, the DEP, through the Bureau of Clean Water ("BCW"), has approval from the EPA to administer an NPDES permit program for the Commonwealth. The BCW issues general NPDES permits regulating water pollutant discharges from various categories of dischargers.

35. Pennsylvania law defines "pollution" as:

> contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The department shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.

*See* 35 P.S. § 691.1.

36. Pennsylvania law prohibits any person from placing or causing to be placed any industrial wastes or other wastes, in a location where they cause pollution of any waters of the state without a valid, unexpired permit. *See* 35 P.S. § 691.301; 35 P.S. § 691.611; 33 U.S.C. § 1311(a); *see also* 25 Pa. Code Chapters 92a, and 96.

37. The prohibitions set forth in 35 P.S. §§ 691.301, 691.307, and 691.401 are independent of, and apply regardless of, the federal classifications at 40 C.F.R. § 122.26(b)(14) and coverage under the General Permit. Sections 307 and 401 further establish any unpermitted discharge of industrial wastes, and any discharge resulting in pollution, to be a nuisance.

38. Additionally, 25 Pa. Code § 92a.1(b) and 33 U.S.C. § 1342, prohibits any person from discharging any pollutant or causing, permitting, or allowing a discharge of any pollutant

from a point source without applying for and obtaining a general or individual NPDES permit. *See* 25 Pa. Code § 92a.1(b); 33 U.S.C. § 1342.

39. Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards ("WQS"), including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state WQS. *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

40. Pennsylvania regulates water quality by way of a Water Quality Control Plan, which identifies WQS for water bodies within its geographic area. *See* 25 Pa. Code 93.6.

41. Specifically, WQS applicable to Defendant are set forth in Section 93.6 of the Pennsylvania Code. Section 93.6(a) of the Pennsylvania Code states: "Water may not contain substances attributable to point or nonpoint source discharges in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life." *See* 25 Pa. Code 93.6(a).

42. In addition, Section 93.6(b) of the Pennsylvania Code states: "specific substances to be controlled include, but are not limited to, floating materials, oil, grease, scum and substances that produce color, tastes, odors, turbidity or settle to form deposits." *Id*. at 93.6(b).

43. Because the list of specific water quality criteria "does not include all possible substances that could cause pollution . . . [f]or substances not listed, the general criterion that these substances may not be inimical or injurious to the existing or designated water uses applies." *Id*. at 93.7(c).

***The General Permit***

44. Section 402 of the CWA establishes the NPDES program, which allows EPA and states acting under delegated authority to issue NPDES permits for the discharge of pollutants

from a point source. 33 U.S.C. § 1342. Any person who discharges a pollutant must apply for an NPDES permit unless they are exempt under the statute or the EPA regulations implementing it. *See* 40 C.F.R. § 122.21(a).

45. The General Permit is an NPDES permit issued pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p). Violations of the General Permit are also violations of the CWA. *See* General Permit, Part B, § I(A).

46. The General Permit's Discharge Prohibitions prohibit stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. *See* General Permit, Part A, §§ I(B), I(C).

47. On or about March 24, 2023, the DEP adopted an updated NPDES General Permit for Discharges of Stormwater Associated with Industrial Activity. The changes made in the updated General Permit were adopted to be consistent with the United States EPA's Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "MSGP") that was reissued and updated in 2015. As of approximately March 24, 2023, the General Permit has superseded and rescinded the Previous PAG-03 General Permit except for purposes of enforcement actions brought pursuant to the prior permit.

48. The General Permit is intended to provide NPDES permit coverage for discharges of stormwater associated with industrial activity, as defined at 40 CFR § 122.26(b)(14) (excluding §§ 122.26(b)(14)(iii) for mineral industry, 122.26(b)(14)(ix) for sewage treatment works and 122.26(b)(14)(x) for stormwater associated with construction activity), and other industrial stormwater discharges that may be required to obtain a permit under CSL.

49. Under the CWA and/or the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); General Permit, Part C, § II. The EPA has developed benchmark

levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi Sector Permit, 80 Fed. Reg. 34,403 (June 16, 2015).

50. The Effluent Limitations of the General Permit prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of BMP specified at General Permit, Part C § II, and in the sector specific appendices to the General Permit, which are consistent with the sector specific effluent limitations contained in the EPA MSGP. These benchmark values are reiterated and incorporated into the General Permit. *See* General Permit, Appendices.

51. The General Permit requires dischargers to develop and implement an adequate Preparedness, Prevention and Contingency Plan (a "PPC Plan"). *See* General Permit, Part C, § IV. The General Permit also requires dischargers to review and if necessary, update the PPC Plan on an annual basis, at a minimum, and anytime a specific event triggers such a revision according to the General Permit. *See* General Permit, Part C, § IV(B).

52. The PPC Plan must include, among other requirements, the following: a description and assessment of all Superior Scaffold potential pollutant sources; a description of the BMPs that will reduce or prevent pollutants in stormwater discharges; responsive actions required to be taken in the event of a spill or other pollution incidents; identify areas of the facility in which, due to topography or other factors, have a high potential for soil erosion, and identify measures to limit such erosion; address security measures to prevent accidental or intentional entry which could result in an unintentional discharge of pollutants; a plan for training employees and contractors on pollution prevention, BMPs, and emergency response measures; include a site map that shows

structures, impervious surfaces, control measures, receiving waters, stormwater conveyances, monitoring points, and non-stormwater discharge sites identify releases of "Water Priority Chemicals" within the previous three years; and, identify spill prevention control and countermeasure plans that may be used to meet the requirements of the General Permit. *See* General Permit, Part C, § IV(A).

53. The General Permit requires facility operators to develop and implement a Stormwater Self-Monitoring, Reporting and Recordkeeping Program. *See* General Permit, Part A § III, Part C § V. The General Permit requires that facility operators create and implement a Stormwater Self-Monitoring, Reporting and Recordkeeping Program to ensure that each of a facility's stormwater discharges comply with the Discharge Prohibitions and Effluent Limitations specified in the General Permit. Facility operators must ensure that their Stormwater Self-Monitoring, Reporting and Recordkeeping Program practices reduce or prevent pollutants in stormwater and authorized non-stormwater discharges as well as evaluate and revise their practices to meet changing conditions at the facility. *Id.* This may include revising the PPC Plan as required by General Permit, Part C, § IV(B).

54. The Stormwater Self-Monitoring, Reporting and Recordkeeping Program must measure the effectiveness of BMPs used to prevent or reduce pollutants in stormwater discharges, and facility operators must revise the Stormwater Self-Monitoring, Reporting and Recordkeeping Program whenever appropriate. *See* General Permit, Part A § III, Part C § V. The General Permit requires facility operators to monitor and collect samples of stormwater discharges from all outfall areas identified as such. *Id.* Facility operators are also required to provide an explanation of monitoring methods describing how a facility's monitoring program will satisfy these objectives. *Id.*

55. Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $68,445 per day per violation for penalties assessed on or after January 8, 2025. 33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.

## STATEMENT OF FACTS

***Facility Description – scaffold and shoring sales, rental, storage, fabrication, and distribution Facility***

56. Plaintiff, through its counsel, has conducted a detailed investigation of the Facility operated by the Defendant at 600 Center Avenue, Unit 2, Bensalem, PA 19020.

57. This investigation reveals that the Facility operates as a "scaffold and shoring sales, rental, storage, fabrication, and distribution." The Facility's activities constitute "storm water discharge[s] associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14), under one or more of the following alternative classifications: (i) the on-site fabrication of custom structural scaffold systems, platforms, and ladders constitutes fabricated metal products manufacturing within SIC Code 3441 (Fabricated Structural Metal Products), which is expressly identified in category (ii) of § 122.26(b)(14) and requires NPDES permit coverage without regard to exposure (corresponding to Appendix U (Fabricated Metal Products) of the General Permit); (ii) related fabrication classifications within SIC Major Group 34 (except 3441) are enumerated in category (xi) of § 122.26(b)(14), and a category (xi) facility must obtain NPDES permit coverage unless it qualifies for and certifies a condition of "no exposure" under 40 C.F.R. § 122.26(g) and 25 Pa. Code § 92a.32(b), an exclusion unavailable where any industrial materials or activities are exposed to precipitation and which, on information and belief, Superior Scaffold has never sought

or obtained; (iii) the accumulation and handling of scrap steel and used equipment constitutes activity within SIC Code 5093 and category (vi) of § 122.26(b)(14); and (iv) in the alternative, to the extent the Facility's industrial activities are not described by any sector-specific appendix to the General Permit, the Facility is subject to permitting under Appendix J of the General Permit.

58. Regardless of the SIC Code under which Superior Scaffold characterizes its operations, NPDES permit coverage is determined based on the industrial activities actually conducted at the Facility. *See*, General Permit, Fact Sheet; 40 C.F.R. § 122.26(b)(14); 25 Pa. Code § 92a.32. Plaintiff's investigation confirms that the Facility stores substantial quantities of scaffolding components, galvanized and corroding steel, pipe stock, lumber, pallets, and related industrial materials outdoors; ponded stormwater has been observed in contact with stored industrial materials; and that materials are handled throughout the yard by forklift and truck. These practices create stormwater exposure independent of any discrete construction project and establish that the Facility conducts stormwater discharges associated with industrial activity requiring NPDES permit coverage under 40 C.F.R. § 122.26(b)(14) (including categories (ii) and (vi)) and the corresponding sector-specific appendices to the General Permit; in the alternative, these practices bring the Facility within Appendix J (Additional Industrial Facilities) of the General Permit. *See*, General Permit, Fact Sheet, PAG-03 Appendix § J, p. 4.

59. Appendix J of the General Permit applies to stormwater discharges associated with industrial activity from facilities whose industrial activity is not described by any other appendix in this General Permit and are designated as needing a permit in accordance with the CSL and/or 40 CFR § 122.26. *See*, General Permit, PAG-03 Appendix J, p. J-1.

60. Defendant's website, www.superiorscaffold.com, publicly represents that, in addition to scaffold sales and rental, "we can provide custom designs and fabrications for any

need," and that "[w]hen standard scaffolding, platforms, or ladders won't fit your job needs, Superior can design and build a custom system for you."[1]

***Activities Resulting in Polluted Stormwater Runoff***

61. Operations at the Facility generally include, but are not limited to, fabrication of custom scaffold platforms, storage of substantial quantities of scaffolding components, galvanized and corroding steel, pipe stock, lumber, pallets, and related industrial materials outdoors. Repair and maintenance activities carried out at the facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties. Other activities likely carried out in the regular course of business at the Facility include storage of fuel and other oils, maintenance, equipment storage, and waste storage.

62. Certain operations at the Facility occur outdoors and are causing pollutants to be exposed to rainfall.

63. Specifically, Plaintiff's investigation has documented industrial processes at the Facility exposed to stormwater, including, but not limited to:

a. The storage of industrial machinery and products outdoors and not under cover, and exposed to stormwater, including:

   i. Numerous large metal components stacked and left uncovered and exposed to rainfall;

   ii. Scaffolding components left uncovered and exposed to rainfall;

   iii. Galvanized and corroding steel left uncovered and exposed to rainfall;

   iv. Numerous large piles of pipe stock left uncovered and exposed to rainfall;

   v. Numerous large piles of lumber left uncovered and exposed to rainfall;

[1] *See,* Defendant's website at https://www.superiorscaffold.com

vi. Numerous large piles of pallets left uncovered and exposed to rainfall;

vii. Metal containers loaded with metal materials and left uncovered and exposed to rainfall;

viii. Dumpsters filled with materials and left uncovered and exposed to rainfall;

ix. Numerous large material transport vehicles;

x. Metal transport equipment; and

xi. Refuse.

b. The carrying out of industrial processes outdoors and not under cover, including the use of the list of industrial machinery and products mentioned above.




64. Vehicles and equipment at the Facility expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

65. The types of pollutants released by the Facility into the immediate environment are known to include, or have the potential to include, among other contaminants; Total Nitrogen, Total Phosphorus, Total Suspended Solids ("TSS"), Oil and Grease, pH, Nitrate + Nitrite-Nitrogen, Chemical Oxygen Demand, Total Aluminum, Total Iron, and Total Zinc, and other pollutants.

66. The industrial materials stored, and the pollutants generated at the Facility are exposed to stormwater flows.

67. Activities at the Facility generate significant debris and particulate matter, which contain pollutants that settle on surfaces within the Facility. During rain events, this pollution washes off those surfaces and flows via direct flow into the Bensalem Township MS4 sewer system, which empties directly into the Delaware River. The polluted stormwater discharges from the Facility via direct flow into the Bensalem Township MS4 sewer system, which empties directly into the Delaware River and the overall Delaware River Watershed, before eventually reaching the Delaware Bay and the Atlantic Ocean.



***Activities Contributing to CWA Violations***

68. Defendant has, and continues to have, failed to obtain coverage for the Facility under the General Permit.

69. Defendant has not developed and/or implemented an adequate PPC Plan at the Facility.

70. Defendant has not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facility.

71. Defendant has not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility.

72. Defendant has not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

73. Defendant has not developed and/or implemented adequate measures to reduce or eliminate stormwater pollution that constitute BAT/BCT.

74. Defendant has not developed and/or implemented adequate BMPs at the Facility to achieve stormwater discharges that meet EPA Benchmarks or applicable Water Quality Standards.

75. Defendant has not adequately evaluated and revised the Facility's PPC Plan to address these failures. Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the Facility to achieve compliance with the General Permit and its PPC Plan requirements.

76. Defendant has not developed and/or implemented an adequate Stormwater Self-Monitoring, Reporting and Recordkeeping Program at the Facility which has resulted in practices that do not adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facility.

77. Defendant's monitoring activities, or lack thereof, have not effectively identified compliance problems at the Facility or resulted in effective revisions of the PPC Plan.

78. Due to Defendant's lack of effective pollution prevention measures, including effective BMPs, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents. The potential pollutants from the Facility include among other contaminants; Total Nitrogen, Total Phosphorus, Total

Suspended Solids ("TSS"), Oil and Grease, pH, Nitrate + Nitrite-Nitrogen, Chemical Oxygen Demand, Total Aluminum, Total Iron, and Total Zinc, waste oils, lubricants, fuel, trash, debris, hazardous materials, and other pollutants. Stormwater from the Facility discharges via direct flow into the Bensalem Township MS4 sewer system, which empties directly into the Delaware River, and the overall Delaware River Watershed, of which the Delaware River is a part.

79. Polluted stormwater is discharged from the Facility via direct flow into the Bensalem Township MS4 sewer system, which empties directly into the Delaware River, and the overall Delaware River Watershed, of which the Delaware River is a part. The Delaware River, its tributaries, and the overall Delaware River Watershed are waters of the United States.

80. As the Defendant failed to obtain any coverage for the Facility since it was required to do so as of June 2021, the stormwater testing for the required pollutant parameters during the period since that date to the time Plaintiff served its Notice of Violations upon Defendant was non-existent and insufficient. Specifically, as the Defendant has not obtained coverage under the General Permit, they have not submitted any Discharge Monitoring Reports ("DMR") for any of the required reporting periods in the years 2021, 2022, 2023, 2024, 2025, or the current 2026 annual reporting periods. As stated in the General Permit, facilities are required to provide DMRs semiannually.

81. Significantly, the pollutants associated with Appendix J are particularly dangerous to riverine ecosystems, including: (i) Total Nitrogen; (ii) Total Phosphorus; (iii) pH; (iv) Total Suspended Solids ("TSS"); (v) Oil and Grease; and (vi) Chemical Oxygen Demand. Additionally, the pollutants associated with Appendix U are particularly dangerous to riverine ecosystems, including: (i) Total Nitrogen; (ii) Total Phosphorus; (iii) pH; (iv) Total Suspended Solids ("TSS"); (v) Oil and Grease; (vi) Nitrate-Nitrite-Nitrogen; (vii) Total Aluminum; (viii) Total Iron; and (ix) Total Zinc.

82. Failures to adequately test stormwater runoff, as is the case here, make it difficult to determine both the amount of pollutants being discharged in a facility's stormwater, and the efficacy of any control measures put in place.

83. In addition, due to Defendant's failure to obtain coverage under the General Permit, no PPC Plan containing adequate BMPs representing BATs and BCTs has been put in place at the Facility. Such a failure can indicate only that no pollution control measures whatsoever are currently being implemented at the Facility.

84. Due to the complete failure of the Defendant to even attempt compliance with the General Permit by obtaining coverage, it is likely that no pollution control measures are being implemented at the Facility at all. The Facility's discharges of stormwater have therefore been, are, and are likely to continue to be regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT.

## FIRST CAUSE OF ACTION

### Failure to Obtain NPDES Permit Coverage for Stormwater Discharges

85. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

86. The CWA and CSL prohibit any person from placing or causing to be placed, any industrial wastes or other wastes, in a location where they cause pollution of any waters of the state without a valid, unexpired permit. *See* 35 P.S. § 691.301; 35 P.S. § 691.611; 33 U.S.C. § 1311(a); *see also* 25 Pa. Code Chapters 92a, and 96.

87. The CWA and CSL prohibit any person from discharging any pollutant or causing, permitting, or allowing a discharge of any pollutant from a point source without applying for and obtaining a general or individual NPDES permit. *See* 25 Pa. Code § 92a.1(b); 33 U.S.C. § 1342.

88. Defendant's Facility is a "scaffold and shoring sales, rental, storage, fabrication, and distribution" facility.

89. Consequently, Defendant was required to, but did not, obtain NPDES permit coverage for the discharges from its Facility through the General Permit.

90. Defendant has, and continues to have, failed to obtain proper coverage under the General Permit.

91. Since at least June 2021, Defendant has been discharging polluted stormwater from the Facility without coverage under the General Permit, and therefore in violation of the Prohibitions of the General Permit during every significant rain event (rainfall event generating 0.1 inches or more of rain). *See* Exhibit 1, Notice Letter at Attachment 3.

92. The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the General Permit.

93. Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of the General Permit and the Water Quality Standards set forth in Section 93.6 of the Pennsylvania Code.

94. Each day since at least June 2021, that Defendant has discharged polluted stormwater from the Facility in violation of the General Permit is a separate and distinct violation of CWA Section 301(a), 33 U.S.C. § 1311(a), as well as a separate and distinct violation of the CSL 35 P.S. § 691.301.

95. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA Sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

96. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm it has no plain, speedy, or adequate remedy at law.

97. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

### Discharges in Violation of Permit Prohibitions of the General Permit

98. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

99. The CWA and CSL prohibit any person from placing or causing to be placed, any industrial wastes or other wastes, in a location where they cause pollution of any waters of the state without a valid, unexpired permit. *See* 35 P.S. § 691.301; 35 P.S. § 691.611; 33 U.S.C. § 1311(a); *see also* 25 Pa. Code Chapters 92a, and 96.

100. The CWA and CSL prohibit any person from discharging any pollutant or causing, permitting, or allowing a discharge of any pollutant from a point source without applying for and obtaining a general or individual NPDES permit. *See* 25 Pa. Code § 92a.1(b); 33 U.S.C. § 1342.

101. Defendant's Facility is a "scaffold and shoring sales, rental, storage, fabrication, and distribution" facility.

102. Defendant has, and continues to have, failed to obtain proper coverage under the General Permit.

103. Since at least June 2021, Defendant has been discharging polluted stormwater from the Facility without coverage under the General Permit, and therefore in violation of the Prohibitions of the General Permit during every significant rain event (rainfall event generating 0.1 inches or more of rain). *See* Exhibit 1, Notice Letter at Attachment 3.

104. The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the General Permit.

105. Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of the General Permit and the Water Quality Standards set forth in Section 93.6 of the Pennsylvania Code.

106. Each day since at least June 2021, Defendant has discharged polluted stormwater from the Facility in violation of the General Permit is a separate and distinct violation of CWA Section 301(a), 33 U.S.C. § 1311(a), as well as a separate and distinct violation of the CSL 35 P.S. § 691.301.

107. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA Sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

108. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm it has no plain, speedy, or adequate remedy at law.

109. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**THIRD CAUSE OF ACTION**

**Discharge in Violation of Effluent Limitations of the General Permit**

110. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

111. The General Permit's PPC Plan requirements and effluent limitations require dischargers to reduce or prevent pollutants in their stormwater discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

112. Defendant has failed to create and/or implement any PPC Plan whatsoever and has thus failed to create and/or implement any BMPs constituting BAT and BCTs at the Facility.

113. Therefore, Defendant has discharged and continues to discharge stormwater from the Facility in concentrations above the level commensurate with the application of BMP specified at General Permit, Part C § II, and in the sector specific appendices to the General Permit, which are consistent with the sector specific effluent limitations contained in the EPA MSGP during every significant rain event occurring from June 2021, through the present. Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions at the Facility is a violation of the General Permit and the CWA. *See* General Permit, Part C, § IV; 33 U.S.C. § 1311(b).

114. Each day since at least June 2021, that Defendant has discharged stormwater containing pollutants in violation of the General Permit, specifically *General Permit, Appendices*, is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), as well as a separate and distinct violation of the CSL 35 P.S. § 691.301.

115. Defendant's CWA violations described in the paragraphs above will continue in the future until Defendant develops and implements BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

116. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

117. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

118. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

### Failure to Develop and Implement an Adequate Preparedness, Prevention, and Contingency Plan, In Violation of the General Permit

119. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

120. The General Permit requires dischargers to develop and implement an adequate PPC Plan. *See* General Permit, Part C, § IV. The General Permit also requires dischargers to review and if necessary, update the PPC Plan on an annual basis, at a minimum, and anytime a specific event triggers such a revision according to the General Permit. *See* General Permit, Part C, § IV(B).

121. Defendant, as of June 2021, has commenced industrial activity and continues to conduct industrial activity at the Facility.

122. Defendant has failed and continues to fail to develop and implement an adequate PPC Plan or implement all necessary revisions to the PPC Plan for the Facility as required by the General Permit.

123. Defendant has failed and continues to fail to develop or implement a PPC Plan for the Facility that includes BMPs adequate to meet the requirements of the General Permit, specifically General Permit, Part C, § IV.

124. Defendant has failed and continues to fail to adequately develop or implement a PPC Plan at the Facility that prevents discharges from violating the Discharge Prohibitions, and Effluent Limitations of the General Permit.

125. Each day since June 2021, that Defendant has failed to adequately develop and/or implement a PPC Plan for the Facility in violation of the General Permit, is a separate and distinct violation of CWA Section 301(a), 33 U.S.C. § 1311(a), as well as a separate and distinct violation of the CSL 35 P.S. § 691.301.

126. Defendant has been in violation of the General Permit's PPC Plan requirements every day since June 2021. Defendant will continue to be in violation of the PPC Plan requirements each day that Defendant fails to develop and fully implement an adequate PPC Plan for the Facility.

127. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA Sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

128. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

129. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FIFTH CAUSE OF ACTION

### Failure to Develop and Implement Adequate Stormwater Monitoring and Recordkeeping, In Violation of the General Permit

130. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

131. Defendant has discharged and continues to discharge pollutants from the Facility in violation of the General Permit. Defendant is also in violation of the General Permit for repeated failure to report proper semiannual DMRs as required by the General Permit. Thus, Defendant's discharges constitute an unpermitted discharge of pollutants from the Facility to waters of the United States in violation of CWA Section 301(a), 33 U.S.C. § 1311(a), as well as a separate and distinct violation of the CSL 35 P.S. § 691.301.

132. Defendant has been in violation of CWA Section 301(a) every day it has discharged stormwater from the Facility to waters of the United States since June 2021. Defendant will continue to be in violation of the CWA each day that unpermitted stormwater discharges from the Facility to waters of the United States.

133. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

134. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

135. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**SIXTH CAUSE OF ACTION**

**Violations of the Pennsylvania Clean Streams Law, 35 P.S. § 691.301 et seq.**

136. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

137. Pennsylvania law prohibits any person from placing or causing to be placed any industrial wastes or other wastes, in a location where they cause pollution of any waters of the state without a valid, unexpired permit. *See* 35 P.S. § 691.301, 691.307, and 691.401; 35 P.S. § 691.611; *see also* 25 Pa. Code Chapters 92a, and 96.

138. The prohibitions set forth in 35 P.S. §§ 691.301, 691.307, and 691.401 are independent of, and apply regardless of, the federal classifications at 40 C.F.R. § 122.26(b)(14) and coverage under the General Permit. Sections 307 and 401 further establish that any unpermitted discharge of industrial wastes, and any discharge resulting in pollution, constitutes a nuisance.

139. The CSL prohibits any person from discharging any pollutant or causing, permitting, or allowing a discharge of any pollutant from a point source without applying for and obtaining a general or individual NPDES permit. *See* 25 Pa. Code § 92a.1(b).

140. Pennsylvania regulates water quality by way of a Water Quality Control Plan, which identifies WQS for water bodies within its geographic area. *See* 25 Pa. Code 93.6.

141. WQS applicable to Defendant are set forth in Section 93.6 of the Pennsylvania Code. Section 93.6(a) of the Pennsylvania Code states: "Water may not contain substances attributable to point or nonpoint source discharges in concentration or amounts sufficient to be

inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life." *See* 25 Pa. Code 93.6(a).

142. Section 93.6(b) of the Pennsylvania Code states: "specific substances to be controlled include, but are not limited to, floating materials, oil, grease, scum and substances that produce color, tastes, odors, turbidity or settle to form deposits." *Id*. at 93.6(b)

143. Defendant's Facility is a "scaffold and shoring sales, rental, storage, fabrication, and distribution" facility.

144. Defendant has, and continues to have, failed to obtain proper coverage under the General Permit.

145. Since at least June 2021, Defendant has been discharging polluted stormwater from the Facility without coverage under the General Permit, and therefore in violation of the CSL's prohibitions on the unpermitted discharge of industrial wastes and pollution into waters of the Commonwealth during every significant rain event (rainfall event generating 0.1 inches or more of rain). *See* Exhibit 1, Notice Letter at Attachment 3.

146. The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the General Permit.

147. Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the Commonwealth in violation of the CSL and the Water Quality Standards set forth in Section 93.6 of the Pennsylvania Code.

148. Each day since at least June 2021 that Defendant has discharged industrial wastes and pollutants from the Facility into waters of the Commonwealth without a valid permit is a separate and distinct violation of the CSL, 35 P.S. §§ 691.301, 691.307, and 691.401.

149. CSL authorizes any person having an interest that is or may be adversely affected to commence a civil action to compel compliance with the Act. 35 P.S. § 691.601(c). The Court is further authorized to award costs of litigation, including attorney and expert witness fees, to any party. 35 P.S. § 691.601(g).

150. By committing the acts and omissions alleged above, Defendant is subject to injunctive relief and to an award of costs of litigation, including attorney and expert witness fees, pursuant to 35 P.S. § 691.601.

151. An action for injunctive relief is authorized by 35 P.S. § 691.601. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm it has no plain, speedy, or adequate remedy at law.

152. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## **RELIEF REQUESTED**

Plaintiff respectfully requests this Court to grant the following relief:

A. Declare Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the General Permit;

B. Declare Defendant to have violated and to be in violation of the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.301, 691.307, and 691.401, for discharging industrial wastes and pollutants into the waters of the Commonwealth without a valid permit;

C. Enjoin Defendant from discharging pollutants from the Facility to stormwater discharge points, which discharge via direct flow into the Bensalem Township MS4 sewer system, which empties directly into the Delaware River, and the overall Delaware River Watershed;

D. Order Defendant to restore all receiving waters damaged by Defendant's illegal discharges of pollutants from the Facility;

E. Enjoin Defendant from violating Sections 301(a) and (b) and Section 402(p) of the Clean Water Act and violating the substantive and procedural requirements of the General Permit, and violating the Pennsylvania Clean Streams Law at the Facility;

F. Order Defendant to apply for and obtain NPDES permit coverage for the Facility and to develop and implement an adequate Preparedness, Prevention and Contingency Plan and stormwater self-monitoring program;

G. Order Defendant to pay civil penalties of up to $68,445 per day per violation for penalties assessed on or after January 8, 2025. 33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4;

H. Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA Section 505(d), 33 U.S.C. § 1365(d), and the CSL, 35 P.S. § 691.601(g);

I. Award such other relief as this Court may deem appropriate.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: October 28, 2026

**BRODSKY SMITH**

By: Marc L. Ackerman

Evan J. Smith, Esquire (SBN 79032)
esmith@brodskysmith.com
Marc L. Ackerman, Esquire (SBN 56294)
mackerman@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 316350)
rcardona@brodskysmith.com
Two Bala Plaza, Ste. 805
Bala Cynwyd, PA 19004
Telephone: (610) 667-6200
Facsimile: (610) 667-9029

*Attorneys for Plaintiff*